Regular Arbitration Panel

| | |
|---|---|
| In the Matter of Arbitration ) | |
| ) | |
| between ) | Grievant: Coldren |
| ) | |
| UNITED STATES POSTAL SERVICE ) | Post Office: Columbus, OH P&DC |
| ) | |
| and ) | Case No: C00C-4C-D 05017281 |
| ) | |
| AMERICAN POSTAL WORKERS ) | APWU Case No.: 1141226KS |
| UNION, AFL-CIO ) | |

Before:    Jerry A. Fullmer, Arbitrator

Appearances:

   For the U. S. Postal Service:  Marvin B. Coleman

   For the Union: Michael D. Schmid

Place of Hearing: Columbus, OH P& DC

Date of Hearing: April 12, 2005

Date of Award: April 26, 2005

Relevant Contract Provision: Article 16

Contract Year:            2000-2005

Type of Grievance: Removal

## Award Summary

Grievant removed on November 8, 2004 for "Improper Conduct" in nature of misappropriation of $200 to $250 of postal funds for use on personal incidentals. Held, grievance sustained. Employer considered three invalid "elements" of record in deciding on removal. Remedy to include back pay and expungement but not reinstatement. Latter withheld because of the written "confession" by Grievant of the misappropriation. Grievant's efforts to disavow "confession" on basis of browbeating and confusion over word "misappropriation" held unavailing.

Jerry A. Fullmer

This case[1] concerns the removal of the Grievant, Otis I. Coldren III, on November 8, 2004 for "Improper Conduct" in the nature of misappropriation of Postal funds.

I.  FACTS

A.  Background Facts

The Grievant has been employed by the Employer since August 28, 1978. At the time of the events in question he was serving as the Clerk at the Philatelic office in West Worthington, OH Post Office. One other clerk, Ripley Bode, had a similar assignment. The Grievant often worked alone. He was under the immediate supervision of Etha Brown, Supervisor of Customer Services. She in return reported to Brenda Seanor, Manager of Customer Services.

The management at the West Worthington office had become worried about what they thought might be thefts from one of the safes. The Postal Inspection Service was contacted and surveillance undertaken on June 16, 2004.. The Grievant had had what was considered to be "numerous shortages" on his Form 3368 audits.[2] He was made the subject of at least part of the surveillance. The surveillance was accomplished by wiring up a camera already overhead in the Philatelic Office and also installing a new, second, camera in the panels at the rear of that office. Time lapse video recordings were then made of the Grievant's activities through both of these cameras. (Employer Ex. 1) The surveillance was under the charge of Postal Inspector T. J. Doyle.

B.  Facts Leading to the Grievance

By October 13, 2004 PI Doyle thought that she had ferreted out enough adverse information on the tapes to make it worthwhile to interview the Grievant. The information on the tapes included:

---

[1] The United States Postal Service (hereafter referred to as "the Employer") and the American Postal Workers Union, AFL-CIO (hereafter referred to as "the Union"), are parties to a collective bargaining agreement dated November 21, 2000 (Joint Ex. 1). The agreement provides in Article 15 for settlement of disputes through a grievance and arbitration procedure. A dispute has arisen between the parties concerning the removal of the Grievant. The Union's grievance (Joint Ex. 2) concerning this matter was dated November 24, 2004 (Step 2 Grievance Appeal Form). It was submitted to arbitration before this arbitrator who serves on the Allegheny Area APWU Arbitration Panel. A hearing was held on April 12, 2005 at the "Citygate" Columbus, Ohio P & DC. Both advocates made opening and closing statements and presented and cross-examined witnesses. No jurisdictional issues were raised by the parties.
[2] Specifically "From September of 2000 to May of 2003, letters of demand were issued to Mr. Coldren III for shortages totaling $5,857.09". (Jt. Ex. 4)

1

1. Four instances in which the Grievant was observed taking bills out of his cash drawer for no apparent reason and walking away from the window.
2. Ten instances of making change for customers from cash in his wallet.
3. Eleven occasions of failing to enter customer transactions into his Integrated Retail Terminal.
4. Two occasions of making clerk adjustments of legitimate transactions and voiding the postage sales.
5. Five Occasions of entering the cash back portion of debit transactions as postage sales.

(Jt. Ex. 4)[3]

PI Doyle came to the West Worthington post office on that date and contacted SCS Brown who in turn contacted the Grievant.[4] The Grievant agreed to "go downtown" with PI Doyle. The rode to Twin Rivers Drive in PI Doyle's car. Once there the Grievant was asked to take a polygraph. The Grievant signed a "Warning and Waiver of Rights" at 9:50 a.m. (Jt. Ex. 4, Exhibit No. 14) The Waiver had the customary reminders about the rights to remain silent, obtain counsel, stop answering questions and the like. The "Waiver" paragraph stated:

> "I am willing to discuss subjects presented and answer questions. I do not want a lawyer at this time. I understand and know what I am doing. No promises or threats have been made to me and no pressure or coercion of any kind has been used against me."

The polygraph test was given by PI Meyle. Among the questions asked the Grievant were the following:

> "Did you steal any of those missing postal funds?
> Do you know how any of those missing postal funds were spent?"

(Jt. Ex. 11)

According to the report of PI Meyle:

> "An analysis of the physiological responses on the polygraph charges of Otis I. Coldren [III] were indicative of deception. It is the opinion of this examiner that he was not truthful when he denied stealing postal funds from the West Worthington Branch of the Post Office. During a post-test interview, Mr. Coldren admitted stealing postal funds and converting them to his personal use. He specifically stated he had taken cash from his cash drawer on several occasions to pay for personal expenses. He stated he believed he

---

[3] For ease of exposition, paragraph #1 is sometimes henceforth referred to as the "taking cash out of the drawer" accusation and paragraphs #2-5 as the "other" accusations.

[4] The following events are described largely from the perspective of the Employer. The Grievant's version will be discussed below under "Discussion"

was responsible for taking approximately $250. He stated he did not feel he was responsible for the entire amount of the shortages ($5,857.09). He stated he has experienced financial difficulties in his personal life over the last few years. Mr. Coldren provided Postal Inspectors with a written statement."

(Jt. Ex. 4, Exhibit No. 15)

In the aftermath of the polygraph examination PI Doyle confronted the Grievant about his apparent deception and asked him to provide a written statement on the subject. The statement, which was eventually placed in evidence, contained a printed introduction indicating the following:

> "...This statement is being made voluntarily in my own handwriting. No threats, promises, statement is being made voluntarily in my own handwriting. No threats, promises, or coercion of any kind have been used to or against me for the purpose of obtaining this statement. I am furnishing this information solely because it is true to the best of my knowledge"

(Jt. Ex. 4, Exhibit No. 17)

The handwritten portion of the statement stated:

> "In the last two and a half years since my leg problems and the fever and chills when I have been at work when I needed to be on medicine or at the hospital. I have have had some problems keeping the accountability straight at the Philatelic Ctr. I have done a few cash backs debit card and not put the cash in the IRT properly because I didn't know where to put it. I have misapproated cash from the drawer on occations to pay for incidentals to the approx amount of $200. to $250. I don't remember the exact cash amount but I have used these funds for personal expences. I don't think the whole amount of 5,000.00 dollars was spent on personal things. I believe if these accounts were strighted out I could maintain these accounts from now on. I am sorry this has happened and it will not occure again."

(Ibid, spelling, punctuation and syntax<br>from original.)

During the period while the Grievant was at the offices of the Postal Inspection Service he was granted his one request for a break. He went to the rest room and enjoyed a smoke. No particular arrangements were made for lunch. The Grievant drank a cup of coffee which he had brought with him from West Worthington.

Later in the afternoon PI Doyle drove the Grievant back to the West Worthington Post Office. They arrived at about 3:15 p.m.. She brought with her a copy of the Grievant's handwritten statement quoted above. She showed a copy to SCS Brown. Ms. Brown read the

statement and reported being astounded. She walked the Grievant to his locker. In the course of their conversation, according to Ms. Brown, the Grievant admitted stealing the $200.00 to $250.00 of postal funds. After consulting with Labor Relations, Ms. Brown put the Grievant on Emergency Placement and the Grievant was escorted from the premises.

The Grievant was thereafter accorded two pre-disciplinary interviews. One was on October 18, 2004 in which, according to Ms. Brown's notes, there were two significant Q &As:

"Q. Otis why did you steal money from your drawer?

A. I didn't steal the money I needed $5 for the haunted house."

Q. How many times did you take money?

A. Maybe two times."

(Jt. Ex. 3, p. 11)

The Request for Disciplinary Action went forth on October 20, 2004. (Un. Ex. 3) It was signed by SCS Brown and concurred in by MCS Seanor. It indicated that the matter was not in the nature of progressive discipline. The Postal Inspector's Investigative Memorandum was issued on October 22, 2004. (Jt. Ex. 4) A second predisciplinary interview was conducted on October 29, 2004. The Grievant was given the opportunity to review the IM.. With respect to the "taking cash out of the drawer" accusation the Grievant stated, according to Ms. Brown's notes, that "…he was probably making change". He also stated "..He may have had misappropriations but he thinks he replaced the money.". (Jt. Ex. 3, p. 13).

On November 8, 2004 the Grievant was sent to Notice of Proposed Removal – Improper Conduct which is the subject of the present action. It was signed by Etha C. Brown, Supervisor of Customer Services and concurred in by Brenda S. Seanor, Manager of Customer Services. It stated in relevant part that:

> "this is advance written notice that it is being proposed that you be removed from the United States Service no sooner than thirty (30) days from your receipt of this notice. The reason for this action is:

### IMPROPER CONDUCT

On October 13, 2004, Postal Inspector, Tammy Doyle came to the West Worthington Post Office to interview you concerning the Philatelic Unit. You stated to Inspector Doyle, in a sworn statement that due to some medical problems you have had difficulty keeping the accountability straight at the Philatelic Ctr. You also stated, 'I have misappropriated case from the drawer on occasions to pay for incidentals to the approx.

4

amount of $200.00 to $250.00. I don't remember the exact cash amount but I have used these funds for personal expenses. I don't think the whole amount of $5,000.00 was spent on personal things.'

On October 18, 2004, I conducted a Pre-Disciplinary Interview with you. I asked why you stole money from your drawer and you said, 'I didn't steal the money. I needed $5.00 for the haunted house.' I asked how many times you took money and you said, 'Maybe 2 times.' When I asked how much money you had taken from your drawer you said you did not know.....

Item 6 of the IM stated that on June 23, 2004, you were observed taking bills from your cash drawer for no apparent reason and walking away from the window....

[Allegations concerning taking money from own wallet to make change for customers; failing to enter transactions in IRT; adjusting legitimate transactions and voiding the postage sales; entering the cash back portion of debit transactions as postage sales have been omitted]

[citations to Section 661.53, Section 665.2 (k)(1); Section 665.2 (v) and Section 666.2 of the ELM and 18 USC 641 and 18 USC 1711 are omitted.]

In addition, the following elements of your past record have been considered in arriving at this action: Letter of Warning dated May 24, 2003, for Unsatisfactory Performance; Letter of Warning dated January 23, 2004, for Unsatisfactory Attendance; Five (5) day Suspension dated March 1, 2004, Improper Conduct.

You have the right to file a grievance under the Grievance/Arbitration procedures set forth in Article 15 of the National Agreement within fourteen (14) days of your receipt of this notice."

(Jt. Ex. 3)

On November 24, 2004 the grievance at issue (Step 2 Grievance Appeal Form) was filed in writing by the Union. It provided in relevant part that:

> "12 ON 11-10-04 THE GRIEVANT WAS ISSUED A NOTICE OF PROPOSED REMOVAL, FOR ALLEGED IMPROPER CONDUCT. THE UNION POSITION IS THAT THIS ACTION WAS TAKEN WITHOUT JUST CAUSE. MANAGEMENT IS IN VIOLATION OF THE CITED ARTICLES.
>
> **13 CORRECTIVE ACTION REQUESTED**
> EXPUNGE THE INSTANT REMOVAL FROM ALL RECORDS AND RECOMPENSE THE GRIEVANT FOR ANY LOSSES IN WAGES 7 OR BENEFITS. "
>
> (Jt. Ex. 2)

5

A Letter of Decision – Notice of Proposed Removal was filed by the Employer on December 14, 2004. (Jt. Ex. 5) Thereafter the grievance was processed through the steps of the grievance procedure to arbitration.

II.  APPLICABLE CONTRACT PROVISIONS

Article 16, Section 1 [not quoted]

III.  ISSUE

Was the removal of the Grievant, Otis I. Coldren III on November 8, 2004 for just cause? If not, what shall be the remedy?

IV.  POSTIONS OF THE PARTIES

The Employer Position

The issue concerns just cause. The facts show that the Grievant had been forewarned, that an adequate investigation was conducted, that the Grievant admitted that he took money from the cash drawer for personal use, that the Grievant submitted to a polygraph which showed he was deceptive, and that there was thus just cause for his removal. The testimony from the Union stewards and the Grievant was self-serving and should be heavily discounted by the arbitrator. The Grievant violated numerous provisions dealing with financial probity The Service has a justified interest in safeguarding its funds. The rules are inherently reasonable. The cited provisions of the ELM are all to that effect. No employer can be expected to tolerate the behavior of the Grievant.

The arbitrator should thoroughly consider the evidence and arguments presented. When this is done there is no other conclusion to be reached other than that just cause existed.

The Employer cited some eight arbitration cases in support of its position.

The Union Position

The Union agrees that the case concerns just cause, but maintains that it has not been established. The Employer had no direct evidence concerning the claimed misappropriation of funds. Even the PI in her testimony agreed that the video did not provide direct evidence of same. The Employer misguidedly relies on the polygraph at the PI office and upon the Grievant's written statement given there. But, the polygraph is undependable and inadmissible and the

written statement was only obtained by the PIs after browbeating and exhausting the Grievant. Clearly he did not know the meaning of the word "misappropriation" and thought it had to do with not following the proper forms for getting reimbursement for parking fees and the like.

SCS Brown relied solely on the written statement and what she mis-perceived as being a confession to her. She made a botch of the investigation and sent a request for discipline forward even before she had received a copy of the investigative memorandum. There was no proper investigation and the supervisors relied solely on the investigation of the Postal Inspectors. This is an improper delegation of the investigative function, especially since she did not view the video tape made by the PIs. The concurring official did not make an independent investigation and simply rubber stamped both the request for discipline and the eventual notice of proposed removal. The charges made against the Grievant were never made clearly and his due process rights were multiply violated. It is especially significant that the "elements of record" were improperly used in that it was stipulated that they had all either been expunged or were quoted as being more severe than they actually were.

The grievance should be sustained and the remedy asked for in the grievance should be granted.

The Union cited some eight arbitration decisions in support of its position. [citations omitted]

V. DISCUSSION

A. Introduction

The present case is one in which the Grievant was removed on November 8, 2004 for "Improper Conduct". The most serious aspect of the "improper conduct" charge was that of the Grievant's having misappropriated cash from his case drawer in the amount of between $200.00 to $250.00 to pay for incidental personal expenses.

The Union raises a number of defenses both as to the substance of the charge and as to the procedural/due process arguments. We turn first to at least one of the latter and then, as needed to the former and as to any questions of remedy.

B. The Procedural/Due Process Arguments.

Focus may be had on upon the argument concerning the "elements of record" cited by the Employer. The text of the Notice of Proposed Removal on this subject was as follows:

> "In addition, the following elements of your past record have been considered in arriving at this action: Letter of Warning dated May 24, 2003, for Unsatisfactory Performance; Letter of Warning dated January 23, 2004, for Unsatisfactory Attendance; Five (5) day Suspension dated March 1, 2004, Improper Conduct."

(Jt. Ex. 3)

At the hearing there was a stipulation that "of the three disciplines cited, all three had been expunged through grievance procedure settlements" prior to the issuance of the Notice of Proposed Removal. There was thus "consideration" of "elements of your past record" which were not in fact part of the Grievant's past record.

There is a wealth of arbitration authority on this issue. This arbitrator has held a number of times that the consideration of invalid elements of record in a disciplinary action taints the action taken simply because it shows reliance on something that is invalid. The Employer has to be taken at its word as to what it considered to be important in making its decision. It is impossible for an arbitrator to re-construct hypothetically as to what the Employer would have done if it made its decision without consideration of the invalid elements of record.[5]

Further there is an element that just as Clerks are expected to keep their accounts straight, the Employer should be expected to keep its disciplinary records straight. This aspect is recognized by a printed notation in the Employer's "Request for Disciplinary Action" form in which Associate Offices are requested by Columbus Labor Relations to:

> "Provide a signed copy of all currently LIVE disciplinary action, along with any grievance resolves made on those active disciplinary actions."

(Un. Ex. 3)

---

[5] None of the arbitration decisions were cited by the parties at the hearing of the case. Nor did the Employer address the argument and/or make the usual "we would have removed him anyhow" argument in its closing statement. The "we would have removed him anyhow" argument was the subject of an attempted rebuttal by the Union in its closing statement.

The matter need not be further belabored. The conclusion based on arbitration authority, including a number of prior decisions by this arbitrator, is that the reliance on invalid prior elements of record in reaching a removal decision is a violation of just cause concepts.[6]

We turn to considerations of Remedy.

## VI. REMEDY

1. Introduction.

The remedy sought by the Union in its grievance filed on November 24, 2004 was:

> **"13 CORRECTIVE ACTION REQUESTED**
> EXPUNGE THE INSTANT REMOVAL FROM ALL RECORDS AND RECOMPENSE THE GRIEVANT FOR ANY LOSSES IN WAGES 7 OR BENEFITS. "
>
> (Jt. Ex. 2)

The Union's written opening statement did not address the subject of remedy. In its closing statement the Union asked that the Grievant "be returned to work with full back pay and benefits." and that the grievance be "sustained in full".

Based on the discussion above, the arbitrator is inclined to grant the grievance and include as a remedy both the expungement and the back pay. These are the elements which were specifically mentioned in the terms of the grievance.

The more difficult issue is whether the remedy should include reinstatement. There is at least a technical justification for not granting that aspect of the remedy in that it was not asked for in the grievance itself and in the Union's opening statement at the hearing. Thus it could be said that the whole grievance procedure and the hearing were conducted on the basis of reinstatement not being in play. But, this rationale may have appeal only to legal minded followers of the arbitration process. It is probably necessary to address the merits of the Grievant's reinstatement to duty.

The accusation against the Grievant, i.e. that of "Improper Conduct" in the nature of the Grievant's misappropriating cash from his drawer in the approximate amount of $200.00 to

---

[6] This conclusion makes it unnecessary to consider the other procedural/due process arguments raised by the Union and the many arbitration decisions cited by it in support of the arguments.

$250.00 and using it for incidental personal expenses is extremely serious.[7] Simply put, taking postal funds to pay for personal expenses is a violation of innumerable postal rules and regulations if not a crime under the cited provisions of the U.S. Code. (18 USC 641 and 1711). If the Grievant did what he is charged with, it is, in this arbitrator's opinion, a matter of sufficient gravity as to preclude his reinstatement as part of the remedy for a meritorious grievance.[8]

The question is then whether the Grievant did commit the acts of which he is accused. The at least initial conclusion must be that he did commit the acts because he signed a written statement confessing that he did so.[9] (See Jt. Ex. 4, Ex. 14) The text of the statement is again quoted:

> "In the last two and a half years since my leg problems and the fever and chills when I have been at work when I needed to be on medicine or at the hospital. I have have had some problems keeping the accountability straight at the Philatelic Ctr. I have done a few cash backs debit card and not put the cash in the IRT properly because I didn't know where to put it. I have misapproated cash from the drawer on occations to pay for incidentals to the approx amount of $200. to $250. I don't remember the exact cash amount but I have used these funds for personal expences. I don't think the whole amount of 5,000.00 dollars was spent on personal things. I believe if these accounts were strighted out I could maintain these accounts from now on. I am sorry this has happened and it will not occure again."

The Grievant has two main defenses with respect to this statement. One is that he was coerced and browbeaten into making the statement. The other concerns a lack of understanding of the term "misappropriation".

---

[7] The text of this accusation is taken from the second paragraph of the Notice of Proposed Removal of November 8, 2004. The Employer cites a number of arbitration decisions upholding removals based on various actions of employees resulting in apparent misappropriations of postal funds. An example of such a case is C00C-4C-D 02233577 (Fullmer, Arb., 2003)

[8] See United Steelworkers v. Enterprise Wheel & Car Corp. 80 S.Ct. 1358, 1361 (1960). Sometimes a discharged grievant is reinstated without back pay. Other times, e.g. when the grievant has committed a violent act or criminal offense in the interim between his grievance and the arbitration hearing, his grievance may be sustained but without reinstatement.

[9] The arbitrator does not rely on the polygraph results as substantive evidence that the Grievant committed the offense. The significance of the polygraph was that it provoked a confession by the Grievant. Thus the doctrine of the case of W7C-5F-D 22463 (Snow, Arb., June 6, 1991), cited by the Grievant would not seem to apply..

2. The Browbeating.

As to the browbeating, the Grievant rode from West Worthington to "downtown" in PI Doyle's car at about 9:00 a.m.. Presumably the Grievant was breakfasted and rested at this time. If Ms. Doyle had appeared menacing to him he would presumably have not consented to go "downtown" and/or would not have ridden in her car. Obviously going in PI Doyle's car left the Grievant without independent means of egress from the PI headquarters downtown. The arbitrator had a chance to observe PI Doyle in her testimony at the arbitration hearing. She appears to be about 40 years old, 5'7" tall and 140 pounds. She looks like she would not be out of place at a Junior League or PTA meeting.

When the Grievant got to the PI headquarters he consented to the polygraph and signed a written waiver. According to him he was granted his one request for a break and used it to smoke a cigarette and visit the rest room. All of this was done during the morning. According to PI Doyle the Grievant confessed in a post-polygraph interview at 12:40 p.m. as to his financial problems, being broke and that he "had on several occasions converted postal funds for personal use totaling approximately $250.00 and that he had used the money for "incidentals". This statement was done at mid-day when the Grievant should have been still fresh. (See Jt. Ex. 4, Exhibit No. 16)

Eventually the Grievant was asked to make a written statement consistent with his 12.40 p.m. confession. He wrote the above quoted statement. According to the Grievant he did several drafts of the statement which were successively rejected by the PIs (Doyle and Meyle) for reasons which the Grievant said included the absence of the word "misappropriated". PI Doyle did not mention the successive drafts in her testimony and the implication was that the Grievant's first draft was what was included as Exhibit 17 to her Investigative Memorandum. The writing of this statement was apparently concluded by 3:00 p.m. because PI Doyle and the Grievant arrived back at West Worthington at 3:15 p.m..

Based on this record, it is difficult to conclude that the Grievant was browbeaten or coerced by PI Doyle. The actions of the Grievant in consenting to go "downtown"; to take a polygraph; and to engage in a post-polygraph interview with PIs Doyle and Meyle show a degree of consent by the Grievant. There is no allegation of shouting, threats, "good cop -- bad cop", rubber truncheons, sleep deprivation or the like. As indicated Ms. Doyle seems not inherently menacing and the whole affair was concluded during what were apparently the normal business

hours of Grievant's shift. His verbal confession came shortly after Noon. There is no discernable reason for the Grievant to have been exhausted and there is no indication of any requests for breaks, food, water or the like which were denied. The conclusion then is that the evidence does not establish that the Grievant's written statement of April 13, 2004 was the subject of browbeating or coercion.[10]

### 3. The Confusion

The Grievant claims that the statement which he actually signed was somewhat dictated to him by the Postal Inspectors and that he was confused by the term "misappropriation". His reasoning is that he thought that the word referred either to one or the other of the following. One was two occasions when he was involved in traveling Philatelic shows. On these occasions the Grievant would take a cash drawer and stock of Philatelic stamps to show and sell the stamps as required. On two occasions he had to dip into his stock of cash because he lacked any personal funds. One was to pay $1.00 for parking fee and the other was to pay $1.50 for lunch. On both occasions he got personal cash from ATMs on the way back to West Worthington and paid the money back to his drawer. The other was on occasions where, to better serve patrons at his Philatelic counter, he would take money from the cash drawer and go down the hall and purchase the stamps that the customer desired from one of the machines. He would then bring the stamps back to his counter and sell them to the customer and replenish the drawer with the funds obtained from the counter.

There are problems with the explanation. One is that the use of the word "misappropriation" took place in the context of the Grievant's being asked by the polygraph examiner two questions about "stealing" "missing" postal funds. The other context is the dialogue in the 12:40 p.m. interview with PI Doyle about postal funds "converted" to his own use. This context, especially the use of red blooded words such as "stealing", should have put

---

[10] It may also be significant that the "browbeating/coercion" claim was not raised by the Grievant when he returned to West Worthington at 3:15 on the day of the incident; in either of the two pre-disciplinary interviews (October 18, 2004 or October 29, 2004) or in the Step 2 grievance of November 24, 2004 (Jt .Ex. 2)

the Grievant on guard that "misappropriation" was a similar word. Also, in the Grievant's testimony there was no citation to specific dialogue in which the Grievant was told that he had to use the word "misappropriation".

In addition, the first two sentences of his written statement, i.e.:

> "In the last two and a half years since my leg problems and the fever and chills when I have been at work when I needed to be on medicine or at the hospital. I have had some problems keeping the accountability straight at the Philatelic Ctr. ...."

sound very much like a home-made justification from someone who <u>has</u> stolen, converted or misappropriated postal funds rather than something dictated by a Postal Inspector. Typically a Postal Inspector would not be particularly interested in an employee's justification for stealing funds but rather in the fact itself of the stealing.

In addition, the Grievant's statement alluded to the "use" of the funds which were "misappropriated". The use was for "incidental" "personal expenses". These words are common and well understood and have no legal overtones such as the words "steal", "convert" or "misappropriate". If such was the use of the funds then the use does not fit the Grievant's explanation since the there was only $1.50 worth of "personal" expenses (the lunch at the Philatelic show) and only the most strained interpretation could be relied upon to include the parking fee and the purchase of stamps for customers from the machines at the end of the hall as being "incidental" "personal expenses. Similarly the Grievant's estimate of from $200.00 to $250.00 worth of "incidental personal expenses" satisfied by misappropriated funds is somewhat inconsistent with his explanation. One would probably remember how much one had misappropriated from postal funds for personal incidental expenses, but it is unlikely that the Grievant would be able to remember a sum 99% of which consisted of money used to buy stamps for customers at the machines down the hall. Finally, according to SCS Brown's notes of the October 29, 2004 pre-disciplinary interview, the Grievant apparently understood the word "misappropriation" by then.[11]

The conclusion then is that the Grievant is stuck with the dictionary meaning of his handwritten statement indicating that he "misappropriated" cash from the drawer to pay for incidentals of a personal nature. As such the remedy will not provide for his reinstatement.

---

[11] "Otis stated he may have had misappropriations but he thinks he replaced the money." (Jt. Ex. 3, p. 13.

13

VI. CONCLUSION

Based on the above discussion the conclusion is that the grievance must be sustained on the basis that the removal improperly relied upon elements of record which were invalid. The remedy does not include reinstatement because the evidence does indicate that the Grievant did misappropriate postal funds in the amount of $200.00 to $250.00 to use for personal incidentals.

To the extent that it may not otherwise be clear, the issue concerning the merits is answered in the negative, i.e. the removal of the Grievant Otis I. Coldren III on November 8, 2004 was not for just cause. The award draws its essence from the arbitrator's interpretation of Article 16, Section 1 of the parties' agreement.

VII.    AWARD

Grievance sustained. The remedy requested in the grievance, i.e. that of expungement of the records of the removal from the archives as a matter of record and the granting of back pay for the period between when the Grievant stopped active employment (presumably December 8, 2004 and the date of this Award is granted. No reinstatement is provided. Therefore, despite the above expungement, the Grievant's employment with the Employer shall be considered to have ceased. Should the parties be unable to agree on the amount of back pay owing to the Grievant, the arbitrator retains jurisdiction over any such disputes until April 26, 2006.

Jerry A. Fullmer
Arbitrator

Made and entered this
26th day of April, 2005
at Cleveland, Ohio