Regular Arbitration Panel                    MAR 1 6 2005

| | | |
|---|---|---|
| In the Matter of Arbitration | ) | |
| | ) | |
| between | ) | Grievant: Hill |
| | ) | |
| UNITED STATES POSTAL SERVICE | ) | Post Office: Cincinnati, OH |
| | ) | |
| and | ) | Case No: C00C-1C-D 04064655 |
| | ) | |
| AMERICAN POSTAL WORKERS | ) | APWU Case No.: 00CK1347 |
| UNION, AFL-CIO | ) | |

Before:      Jerry A. Fullmer, Arbitrator

Appearances:

      For the U. S. Postal Service:  Doris A. Roberts

      For the Union: Tim Breen

Place of Hearing:  Cincinnati, OH Post Office

Date of Hearing: March 1, 2005

Date of Award: March 15, 2005

Relevant Contract Provision: Article 16, Section 1

Contract Year:                    2000-2005

Type of Grievance: Removal

## Award Summary

Grievant removed on January 20, 2005 for "Improper Conduct" in the nature of "unwanted physical conduct of a sexual nature" with a fellow employee. Held; evidence establishes the offense. Nevertheless, Employer committed two procedural/due process errors which justify sustaining the grievance. Remedy does not include reinstatement due to reprehensible nature of deed. Grievant awarded back pay.

Jerry A. Fullmer

This case[1] concerns  the removal of the Grievant, Stuart Hill, on January 20, 2005 for "Improper Conduct", in the nature of "unwelcome physical contact of a sexual nature" with the Complaining Witness, Veda Brown.

I.      FACTS

   A.      Background Facts

   The Grievant has worked for the Employer for some 16 years, including 4 and ½ as a casual, 1 as a temporary, 2 as a part time flexible and 9 as a full time regular. At the time of the events in question he was serving as a Mail Processor on a Flat Sorter Machine.

   One of his fellow employees was a Mail Handler, Veda Brown who is hereafter referred to as "the Complaining Witness". There was no indication that they particularly worked together. The Grievant described the Complaining Witness as a workplace "friend" of his, although there was no evidence that they were "social" friends or had dated. The Complaining Witness described the Grievant as someone she was at least acquainted with from riding the same bus to work, but did not describe him as a friend.

   B.      Facts Leading to the Grievance

   On Sunday, October 26, 2003 there was an alleged incident between the Grievant and the Complaining Witness which eventually led to the Grievant's removal. The general outlines of the incident are as follows. The Grievant was not scheduled for duty that day. The Grievant was a season ticket holder of the Cincinnati Bengals, the local National Football League franchise. He attended that afternoon's game between the Bengals and the Seattle Seahawks which was won by Cincinnati. It was the "early" game in NFL parlance and these take place between 1:00 p.m. and 4:30 p.m.. The game was preceded and followed by a certain amount of "tailgating".. One of the

-------

[1] The United States Postal Service (hereafter referred to as "the Employer") and the American Postal Workers Union, AFL-CIO (hereafter referred to as "the Union"), are parties to a collective bargaining agreement dated November 21, 2000 (Joint Ex. 1).  The agreement provides in Article 15 for settlement of disputes through a grievance and arbitration procedure. A dispute has arisen between the parties concerning  the removal of the Grievant, Stuart Hill, on January 20, 2004 for "Improper Conduct", in the nature of  "unwelcome physical contact of a sexual nature" with the Complaining Witness, Veda Brown. The Union's grievance (Joint Ex. 2) concerning this matter was dated January 28, 2004.  (Step 2 Grievance Appeal Form) It was submitted to arbitration before this arbitrator who serves on the Allegheny Area APWU Arbitration Panel.  A hearing was held on March 1, 2005 at the Cincinnati, OH main Post Office. Both advocates made opening and closing statements and presented and cross-examinedtnesses. No jurisdictional issues were raised by the parties.

Grievant's entourage had to go to work at the Post Office on a shift which started after the game. The Grievant rode back to the plant with one of the party to drop off that employee. The Grievant decided to go inside the plant to retrieve a videotape which he had lent to another employee. The tape needed to be returned on Monday morning.

In the meantime the Complaining Witness had been working on her assigned shift at the plant. Her lunch break started at 5:30 p.m. Afterwards she went outside for a smoke. She started to return to her work station at about 5:55. She got on the elevator to return and pressed "2" for the applicable floor. As she was entering the elevator the Grievant also entered.. According to the Complaining Witness, the Grievant reached over her shoulder and turned out the lights in the elevator. He grabbed her head and shoved it forcefully into the corner of the elevator. He started to kiss her and shove his tongue down her throat. She could taste and smell liquor on his breath. She tried to shove him away, but couldn't because her arms were pinned to the sides of the corner of the elevator. She tried to push him away with one hand and punch him with the other. She testified that  it took a long, long time for the elevator to reach the second floor. When she could first see some light from the doors starting to open, she knocked against them and tried to get out. She was distressed and encountered a casual, Andre' Booker. He saw that she was distressed. She ran into the break area.[2] The Complaining Witness testified that she was distressed for the remainder of the shift and that she could not sleep that night. She was reliving the experience and trying to decide whether to come forward and report it. The Grievant's testimony at the arbitration hearing was that he did return to the plant as alleged; did take the elevator in question; did flick the light on and off; but did not attempt to kiss or otherwise touch Ms. Brown.

The Grievant  did come forward and report the incident a few days later to MDO Noah Huff. An investigation ensued which will be discussed in more detail below. Eventually, on January 6, 2004 a "Supervisor's Request for Disciplinary Action" went forward requesting the Grievant's removal. (Jt. Ex. 3, pp. 3-4). The Request was signed by SDO Emhoolah and it was concurred in by MDO Michael Pauley.

On January 20, 2004 the Employer sent the Grievant the Notice of Removal which is the subject of this case, over the signature of Kathy Emhoolah, Supervisor of Customer Services. It stated in relevant portion that:

---

[2] The preceding is essentially the Complaining Witness's version of the incident.

"You are hereby notified that you will be removed from the Postal Service on February 28, 2004. The reasons for this action are:

**Improper Conduct**

It is well documented that you have been instructed and trained on the Postal Services position regarding sexual harassment. Veda Brown reported, on October 26, 2003, while on the elevator in building "B" you made unwelcome physical contact of a sexual nature with here. Ms. Brown stated that you turned off the light on the elevator and then pressed your body firmly up against hers. Additionally she stated that you put your tongue in her mouth. Ms. Brown stated she tried to get away by pushing you off of her but she couldn't get free because of the grip you had on her head. Ms. Brown said shortly after you let go of her, the door opened on the elevator and she immediately exited the elevator. Ms. Brown stated as she exited the elevator Andre Booker was standing by the elevator. When I questioned you concerning this matter you denied anything took place. In fact you denied even being at the Cincinnati P & DC on October 26, 2003. I have taken your response into consideration but find that it is without merit. Through the investigation into this matter Mr. Booker stated that on October 26, 2003, when the elevator door opened the light inside was off, but then it was turned on. Mr. Booker stated that it was obvious that Ms. Brown was shaken as she exited the elevator and you were definitely on the elevator.

Based on the investigation I feel your actions were improper, especially in light of the amount of training and service talks that has been given to you by the Postal Service. Your conduct creates unpleasant working conditions. Your actions obviously are impeding the efficiency and economy of the Postal Service. Your actions are considered so egregious, that your employment with the Postal Service cannot continue.

[citations to Zero Tolerance Policy; and ELM Sections 661.53; 666.1 and 666.2 omitted]

(Jt. Ex. 3, pp. 2)

The grievance at issue was filed at Step 2 on January 28, 2004. It provided in relevant portion that:

"ON JANUARY 21, 2004 AT THE CINCINNATI, OHIO MAIN POST OFFICE, MANAGEMENT ISSUED THE GRIEVANT A NOTICE OF REMOVAL DATED JANUARY 20, 2004.
    SAID NOTICE OF REMOVAL IS PUNITIVE, NOT CORRECTIVE IN NATURE, WITHOUT JUST CAUSE AND PROCEDURALLY DEFECTIVE.
**13 CORRECTIVE AQCTION REQUESTED**
THAT THE NOTICE OF REMOVAL DATED JANUARY 20, 2004 BE RESCINDED AND EXPUNGED FROM ALL OFFICIAL POSTAL RECORDS AND THE GRIEVANT BE MADE WHOLE, INCLUDING APPROPRIATE INTEREST."

(Jt. Ex. 3, pp/ 1-2)

The grievance was thence processed through the steps of the grievance procedure to arbitration.

3

II.    APPLICABLE CONTRACT PROVISIONS

Article 16, Section 1


III.    ISSUE

Was the removal of the Grievant, Stuart Hill, on January 20, 2004 for just cause? If not, what shall be the remedy?


IV.    POSTIONS OF THE PARTIES

The Employer Position

The Employer emphasizes the seriousness of the Grievant's violation. It bordered on rape, assault and forced imposition. It was far from the nature of a stolen kiss or the like. The Grievant's actions had a most serious effect on the complaining witness, Ms. Brown. She was distraught and extremely reluctant to return to work where she might have to face the Grievant. Eventually she was off on a eight month absence which led to her removal. She only got back her employment by the skin of her teeth. There is no way that the actions of the Grievant can be supported by any imagination. He was repeatedly trained on the Zero Tolerance and Sexual Harassment policies and it was stipulated at the hearing that he had notice.

The matter was first investigated by a Fact Finding. This is used in all sexual harassment cases. The committee met and interviewed all the relevant witnesses. This takes time and the report was not concluded until late December. There was no need to give the Union a copy of the report. The Union was given all the documentation which SDO Emhoolah used in her request for discipline, namely the several written statements utilized. This included the written statement of the casual, Andre' Booker. Mr. Booker could not testify at the arbitration hearing because he had been terminated in the interim.

The Grievant was accorded a pre-disciplinary interview under the aegis of SDO Emhoolah on January 6, 2004. The Grievant had a full chance to have his "day in court" and a full opportunity to present his side of the case. At the conclusion of the interview he did not add anything and simply walked out. Significantly the Grievant tried to evade the charge by claiming that he had both not been working and had not been in the building. The Grievant and the Union stuck to this story until they were eventually smoked out by the presentation of the "rings" for

4

the day which showed definitely that the Grievant had been in the building at the times in question. This attempt by the Grievant and his cohorts further denigrates his credibility.

Employees at the Cincinnati post office should be able to report for work without being nervous in the anticipation of sexual assaults such as this. It was not a simple kiss. Ms. Brown had to force the Grievant away and the aftermath of the assault was witnessed by the casual, Andre' Booker.

There is no in between position. Just cause exists and the proper procedural steps were taken. The grievance should be dismissed and the removal upheld.

The Employer cited one arbitration case in support of its position. [citation omitted]

The Union Position

The Grievant has a long and distinguished postal career. He was repeatedly re-hired as a casual and is a good worker. The incident involved in this case took place on October 26, 2003. The Grievant was not even interviewed by his supervisor, SDO Emhoolah until January 6, 2004, two and one half months later. In the meantime the Grievant's memory had understandably diminished. He knew that he had not been scheduled for work on October 26, 2003 because it was a Sunday and not within his regular schedule. But, he didn't think that he had been at the Post Office because it is not a place to go to on one's day off. It was only after he returned home from the interview that he looked at his Bengal ticket stub and remembered that he had gone into the building to get his video. The unconscionably delayed investigation contributed to his foggy memory on the point.

The Employer's only excuse for the delay is that of the Fact Finding investigation by unknown parties. The Union tried valiantly to get a copy of this report, but it was never accorded by the Management. No one knows who did this or why it took so long.

Several Management witnesses admitted that an employee would not be removed for visiting the plant on the his/her day off or for playfully flicking the light switch on the elevator. The kiss in the elevator is a matter of the Grievant's word against that of the complaining witness and the Grievant's denials were credible. The casual, Andre' Booker could not have observed what went on in the elevator unless he had X-ray eyes. Even more importantly the Union never had a chance to cross-examine him about his observations because the Employer removed him between these events and the arbitration hearing.

The Union cited some three arbitration cases in support of its position. [citations omitted]

5

## V.    DISCUSSION

### A.    Introduction

The present case is a removal case in which the Grievant was removed on January 20, 2004 for "Improper Conduct" in the nature of "unwelcome physical contact of a sexual nature" with the Complaining Witness, Veda Brown. The overall issue is stated in terms of the "just cause" standard established by Article 16, Section 1 of the parties' agreement. Within that overall issue there are two main sub-issues. One is whether the evidence establishes that the Grievant committed the offense charged against him. The other is whether the Employer committed procedural/due process errors in the course of the proceedings. We turn to these sub-issues in the order stated.

### B.    The Evidence Concerning the Substantive Offense.

#### 1.    Introduction.

The Zero Tolerance Policy and the Sexual Harassment Policy were not introduced as evidence at the hearing. But, the Union does <u>not</u> maintain that "unwelcome physical contact of a sexual nature" is permissible in the workplace. Also, it was essentially stipulated at the hearing that the Grievant was on notice as to the content of both policies and knew that "unwelcome physical contact of a sexual nature" was prohibited at the Cincinnati Post Office.

The essence of the offense charged against the Grievant <u>was</u> the "unwelcome physical contact of a sexual nature". The Union established through cross examination, and the Employer essentially conceded, that the Grievant's visiting the plant in an off-duty status on October 26, 2003 and the Grievant's flicking the elevator light on and off were not in themselves reason to discipline the Grievant.

#### 2.    The Evidence Concerning the "Unwelcome Physical Contact of a Sexual Nature."

The Complaining Witness has maintained in her initial interview with MDO Huff; in her written statement of November 2, 2003 (Jt. Ex. 3, pp. 5-6) and in her testimony at the arbitration hearing that the Grievant <u>did</u> perpetrate "unwelcome physical contact of a sexual nature" upon her on October 26, 2003. Sequentially the behavior consisted of turning off the elevator lights; grabbing her head in both hands; pressing her head against the corner of the elevator; pressing both his upper and lower body against hers; forcibly kissing her and sticking his tongue down her throat and resisting her efforts to get free,   The Grievant in his testimony at the arbitration

6

hearing claimed that while he was on the elevator and while he flicked the light switch on and off none of the "unwelcome physical contact of a sexual nature" happened.  We thus have a credibility conflict between the two versions and are left with the lugubrious duty of  deciding which version is established by the evidence. The principle is that the Employer's allegations must meet just cause standards as to  a reasonable quantity and quality of evidence.[3]

The following factors seem relevant:

a. The Structural Status of the Two Principal Witnesses.

The Complaining Witness was at most an acquaintance of and fellow bus rider with the Grievant. There is thus no reason to believe that the Grievant would believe that he had some license on the basis of past romance or otherwise to engage in "physical contact of a sexual nature" with the Complaining Witness. He does not make such a claim. The same factors do not indicate any "scorned lover" type of reasons which would lead the Complaining Witness to fabricate accusations toward the Grievant so as to gain romantic revenge against him. Similarly there was no evidence of work place or neighborhood disputes which would lead to that sort of motivation on the part of the Complaining Witness. Thus, in order to believe the Grievant's version of the incident, one is forced to assume that in the course of a spontaneous 16 second elevator  ride[4] the Complaining Witness formulated the intent to falsely accuse the Grievant of "unwelcome physical contact of a physical nature". Absent the factors discussed earlier in this paragraph, it is difficult to fathom any reasons why the Complaining Witness would do such a thing. As she herself testified, any complaint such as the one made in this case would necessarily subject a complaining witness to intense scrutiny, to filling out statements, being interviewed and eventually having to testify in an arbitration hearing. There is also the possibility of unpleasant workplace gossip and/or opprobrium. Under these circumstances, there is no structural reason to assume that the Complaining Witness is fabricating her testimony.

As to the Grievant, it is sometimes speculated that a grievant in a removal case has a pecuniary motivation which may motivate his/her testimony in that he/she stands to regain his/her job if he/she wins the case, possibly along with along with back pay for the period while he/she was off work. This of course does not necessarily mean that the Grievant's testimony was

---

[3] See one of  the cases cited by the Union, i.e.  C98C-1C-D 01197927 (Fullmer, Arb., August 20, 2002).

[4] Based on the testimony of Assistant Clerk Craft Director Patterson. He testified that he timed the elevator shortly after the incident  came to light.

7

false, but there are no structural reasons in support of veracity as is the case with the Complaining Witness.

### b. The Relatively Prompt Reporting of the Incident.

The Complaining Witness reported the incident to MDO Huff a few days after the incident. When a complaining witness is dilatory in reporting the incident to supervision it is usually argued that the delay detracts from the credibility of the report. The converse would also seem to be true, i.e. that a reasonably prompt report lends some credence to the report.

### c. The "Corroboration" by Casual Andre' Booker

The Complaining Witness's account of the incident  indicates that a Casual, Andre' Booker was standing outside the elevator when she got off the elevator and that Mr. Booker witnessed the Grievant turning on the light switch and also observed her anguish in the immediate wake of the incident. Mr. Brown was interviewed by the Fact Finding Committee and gave a written statement (Employer Ex. 1) That statement did not specifically cover the light switch point, but did indicate both that the Complaining Witness was distressed and that Mr. Booker heard the Complaining Witness say "You cut them lights off and scared me to death." MDO Huff added a note to the written statement indicating that Mr. Booker told him that he did see the light come on after the Complaining Witness got off the elevator. That written statement was used by SDO Emhoolah in her investigation, but she did not interview Mr. Booker. Mr. Booker did not testify at the arbitration hearing. It was indicated that he had been removed by the Employer in the meantime because of attendance problems.

The Union correctly points out that it could not cross examine the written statement at the arbitration hearing because Mr. Booker was not attend. The statement was only allowed into evidence by the arbitrator to show the extent of the investigation by SDO Emhoolah. The written statement thus cannot be evidence as to the truth of Mr. Booker's assertions. Nevertheless, it must be observed that either party was free to track Mr. Booker down and subpoena him to appear at the hearing. There is thus something of a stand off of negative inferences from the non-subpoenaing. The inference against the Union is that it did not want to risk subpoenaing Mr. Booker for fear that he would stand by his written statement. That against the Employer is that it did not want to risk a subpoena for fear that Mr. Booker would <u>not</u> stand by his written statement.

8

d. The Grievant's Denial of Being At the Plan

The Grievant admits that at his pre-disciplinary interview on January 6, 2004 he denied not only that he was on the clock at the time of the incident, but that he was in the building. (Jt. Ex. 3, p. 7) By the end of the Step 2 proceedings "on 2/16/04 and numerous subsequent dates", the Union and the Grievant admitted that he was in the building at the time. The Grievant's explanation for his erroneous statement on January 6, 2004 was that the passage of time had dulled his memory. He claimed it was only refreshed when he returned home after the interview and looked at his ticket stubs for the Bengals-Seahawks game. He testified that he then remembered that he visited the plant after the game to pick up his videotape. But, a statement written by the Grievant 16 days after the pre-disciplinary interview, i.e. on January 22, 2004 (Employer Ex. 3) indicates that as late as that date the Grievant was still maintaining that:

> "If there is a quarry on whether I was at work that day, I've got proof that I was not in the facility on that day. In fact I was at the Bengal-Seahawk football game until the end."

This statement shows that the Grievant's memory was not refreshed, as he testified, in the immediate aftermath of the January 6, 2004 pre-disciplinary interview. It was instead apparently not "refreshed" until the Employer eventually dug up the clock rings (Employer Ex. 6) for the day in question. These showed conclusively that the Grievant was on site on the day in question. The attempt to deny his presence at the plant until the falsity of the assertion was proven by the clock rings tends to detract from the Grievant's credibility not only on that but on the other aspects of the incident.

e. The Demeanor of the Witnesses.

The Complaining Witness's testimony at the hearing was marked by tenseness, crying and the necessity of taking a break so that she could regain her composure. In the arbitrator's view these actions were compatible with those of a witness who was recalling past "physical contact of a sexual nature". To note one specific, when the arbitrator, in the course of making a ruling on objection, mentioned the intellectual possibility of the Grievant's version being held credible and the Complaining Witness's not, the Complaining Witness flared in spontaneous righteous indignation. It is of course always possible that a witness is acting out the role expected of him/her when he/she testifies at an arbitration hearing. But, there was no indication of that in the Complaining Witness. On the other hand, the Grievant in his testimony was affable and

9

consistent in his denials. He betrayed no "smoking gun" of incredibility. Nevertheless, the edge on the demeanor factor goes to the Complaining Witness.

f. Conclusion.

The conclusion on the credibility issues is, based especially on factors a., b., and d. above is that the Complaining Witness's version of the events in question is to be credited.

3. The Seriousness of the Offense.

Given the above conclusion, the offense of "Improper Conduct" through the "physical contact of a sexual nature" is found to have been established by the evidence. There is at least an abstract question as to whether the seriousness of the offense is sufficient to justify the removal penalty. The arbitrator holds that it is, for essentially two reasons. One is that the Union did not argue at the hearing that "even if the Grievant did what she said he did, the offense did not rise to the level of a removable offense". The other is that the arbitrator is satisfied that the details of the offense are abhorrent enough that the Employer was justified in imposing the removal[5], absent the procedural/due process problems to which we now turn.

C.    The Procedural/Due Process Points.

1. Introduction.

The Union raises a number of procedural/due process points in which it claims that the Employer's actions in this case do not meet the just cause standards of Article 16, Section 1. Of these, the two which the arbitrator regards as the most persuasive are the delay in imposing the discipline and the failure to interview the Complaining Witness as part of SDO Emhoolah's investigation. We turn to those in the order stated.

2. The Delay in the Imposition of the Discipline.

There is a principle which is generally accepted in the arbitration of disciplinary cases which holds that the discipline should be imposed with reasonable promptitude after the commission of the offense. The parties have apparently accepted this principle in the administration of their agreement. USPS-APWU Joint Contract Interpretation Manual (Un. Ex. 1, page 110. The reasoning is at least two fold. One is the investigation should be completed with reasonable promptitude while the memories of the witnesses are still fresh. The other is that the

---

[5] See in this respect the arbitration case cited by the Employer, C00C-1C-D 04052542 (Arb., Evans, September 17, 2004).

10

employee should not have the matter hanging over his/her head for an unreasonable period until he/she finds out how he/she stands with the employer.

Here there was a delay from October 26, 2003 until January 20, 2004 before the removal was imposed. The Grievant was not accorded his pre-disciplinary interview until January 6, 2004. The delays were thus almost three months.

Whether such a delay is unreasonable or not depends of course on the nature of the case. For instance, a complicated scheme by ten Window Clerks to embezzle money from the Employer by manipulation of the computerized system at the window may call for the expertise of the Postal Inspectors and a lengthy investigation of not only the window accounts, but the employees' personal bank accounts. Here the actual incident involved only the two principals (Grievant and Complaining Witness) and one possible onlooker to the aftermath of the incident (the casual, Andre' Booker). The core of the incident and its immediate aftermath lasted about 20 seconds. Standing alone it would seem that there would be no reason to stretch out the investigation of the incident for almost three months.

The Employer's explanation for the delay is its wait for the conclusion of the proceedings of what is described as a "Fact Finding". That Fact Finding was completed in late December, as the arbitrator understands it. As explained to the arbitrator this is a process where two officials of the Employer, one male and one female, are appointed to make a fact finding concerning sexual harassment cases. They take statements and write a report. The report may or may not be introduced into the disciplinary process. Here the report was not introduced at the hearing and a copy was not given to the Union.

In some cases this arbitrator has acquiesced in some substantial delays in the imposition of discipline while the Postal Inspection Service was completing its work in cases which seemed to justify an extended investigation. But, the Postal Inspection Service is a world recognized investigative agency and the report of the Postal Inspectors is usually placed in evidence. Given the record made in this case, the arbitrator is not convinced that the somewhat ephemeral Fact Finding process by two unnamed personages and without a report is of sufficient *gravitas* as to justify a three month delay in the imposition of discipline in a case such as this.

We turn to the somewhat linked issue of the failure to interview the Complaining Witness.

11

3. The Failure to Interview the Complaining Witness.

The facts are that the Complaining Witness <u>was</u> interviewed during the course of the Fact Finding process described above. She furnished a written statement as part of that process. (Jt. Ex. 3, p. 5 and 6). The record does not indicate whether the Fact Finding officials found the Complaining Witness's version of the facts to be credible or not. SDO Emhoolah took the written statement into account as part of her investigation but did not interview the Complaining Witness.

This arbitrator has previously held that the Employer is not precluded from delegating much of an investigation to the Postal Inspection Service. It is after all the investigative arm of the Employer. But, the Employer retains the duty of having the supervisor requesting the imposition of discipline make an independent review which at least includes giving the Grievant his pre-disciplinary interview.[6]

The essence of the matter at hand is the credibility of the competing versions by the Grievant and the Complaining Witness of what happened during the 15 seconds in the elevator. One of the aspects of making a credibility determination is the appearance and demeanor of the witness as to the events. (See discussion above). Here the Employer proceeded with the removal without having anyone who had heard the Complaining Witness's version of the events make a conclusion that she was credible. The Fact Finding officials heard the version but made no conclusion as to her credibility, at least none that appeared on the record. SDO Emhoolah did not hear the Complaining Witness's version. It seems to the arbitrator that proceeding without a plausible basis for holding the Complaining Witness's version credible is a violation of just cause principles.

4. Conclusion

The conclusion on the procedural/due process questions is that the Employer made two errors, described in the preceding paragraph, which indicate the removal was not for just cause.

VI.    CONCLUSION

The overall conclusion is that the two procedural/due process errors, delay in imposing discipline and failure to interview the Complaining Witness in the course of the supervisorial

---

[6] See Memorandum of Understanding "Re: Role of Inspection Service in Labor Relations Matters", second paragraph.

12

investigation lead to the conclusion that the just cause standards were not met.   To the extent that it may not otherwise be clear, the above stated issue, i.e. that concerning the merits is answered in the negative, i.e. the removal of the Grievant, Stuart Hill, on January 20, 2004 was not for just cause..  The award draws its essence from the arbitrator's interpretation of Article 16, Section 1 of the parties' agreement.

VII. REMEDY

The issues concerning remedy are separate from the issues concerning the merits. It is held that arbitrators have wide discretion to fashion remedies to remedy breaches of labor agreements:

> "When an arbitrator is commissioned to interpret and apply the collective bargaining agreement, he is to bring his informed judgment to bear in order to reach a fair solution of a problem. This is especially true when it comes to formulating remedies. There the need is for flexibility in meeting a wide variety of situations. The draftsmen may never have though of what specific remedy should be awarded to meet a particular contingency...." [7]

The usual remedy in removal cases is reinstatement with full seniority and back pay. Here the usual remedy would result in returning a grievant to the workplace who engaged in the reprehensible conduct described above in the nature of "unwelcome physical contact of a sexual nature". Despite the Employer's procedural/due process errors which have resulted in the sustaining of the grievance, the arbitrator cannot in good conscience countenance the reinstatement of a grievant who has committed the reprehensible acts involved in this case to  the Postal workplace.

---

[7] United Steelworkers v. Enterprise Wheel & Car Corp. 80 S.Ct. 1358, 1361 (1960)

13

VII.    AWARD

Grievance sustained. No reinstatement remedy is granted, but the Grievant is awarded back pay from the date of his removal to the date of this arbitration award. Should the parties be unable to agree on the calculation of this back pay the arbitrator reserves jurisdiction over this case until September 15, 2005 to resolve any disputes on that subject.

Jerry A. Fullmer
Arbitrator

Made and entered this
15th day of  March, 2005
at Cleveland, Ohio

14